SECURITY NATIONAL BANK OF OKLAHOMA CITY, Appellant, v. PEOPLE'S BANK OF SULLIVAN, MISSOURI.

Division One, April 9, 1921.

1. **NEGOTIABLE SECURITIES: Powers of Congress: Delegation of Power.** The Congress of the United States, having power under the Constitution to issue negotiable securities for governmental purposes, has the further power of delegating to the Secretary of the Treasury the determination of the question whether or not such securities should be negotiable, as in the case of the *interim* certificates issued during the World War for bonds not yet ready for delivery.

2. ————: **Liberty Loans: Interim Certificates.** The Act of Congress of April 24, 1917, providing for the issue of Liberty Bonds, gave the Secretary of the Treasury power to issue *interim* certificates to be held until the bonds could be prepared, and also to make them negotiable.

3. ————: **Form and Terms: According to Common Law and State Statutes.** The power of the United States to make its securities negotiable is not subject to any rules of common law or state statute in respect to form or terms.

4. ————: **Negotiable in Form.** Every *interim* certificate issued under the Liberty Loan Act of Congress of 1917 provided that "upon surrender of this *interim* certificate, the bearer hereof will be entitled to receive, when prepared, definitive bonds in the amount of ————dollars, bearing interest from June 15, 1917. This certificate

and all rights under and by virtue hereof shall pass by delivery. ....There must be no writing on this certificate until it is presented for exchange for bonds." *Held*, that these certificates were clearly intended to be and are negotiable instruments.

5. ——: **Theft of Interim Certificates: Bona-Fide Purchasers.** Certain negotiable *interim* certificates of the United States were stolen from a bank in Missouri, and were shortly afterward acquired by a bank in Oklahoma in the ordinary course of business from two of its customers who resided and did business in its home town, without notice of or resaon to suspect any defect in their title, and for their full face value. The Oklahoma bank was at the same time buying from other persons on the same terms. *Held*, that it was a bona-fide purchaser for value, and had the title as against the Missouri bank.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

REVERSED (*with directions*).

*Fordyce, Holliday & White* for appellant.

(1)   Securities issued under acts of Congress exercising its power to borrow money on the credit of the United States, must be construed with regard to such act, and are not governed either as to their character or effect by local law.   U. S. Constitution, Art. 1, sec. 8; United States v. Stephenson, 27 Fed. Cas. 16386; 1 McLean, 462; Legal Tender Case, 110 U. S. 421.   (2)   Even under local law the *interim* certificates are negotiable, because the holder has the option, either to exchange them for definitive bonds or to hold the same until maturity and demand payment in money.   Hodges v. Schuler, 22 N. Y. 114; Hotchkiss v. National Bank, 21 Wall. 354; Jones on Corporate Bonds, sec. 190, p. 213. (3)   *Interim* certificates, or scrip, when they provide for exchange for negotiable bonds, are themselves negotiable under the Law Merchant.   Jones on Corporate Bonds, sec. 184, pp. 207-208; Goodwin v. Roberts, 1 App. Cases, 476; Rumball v. Metropolitan Bank, L. R. (Q. B. D.) 194.

*James Booth* for respondent.

(1) The *interim* certificates were issued and delivered in Missouri by one resident of the State to another resident of the State; and the bonds therein called for were to have been delivered in Missouri. The contract is to be construed by Missouri law. National Bank v. Cudahy, 126 Fed. 543; Trower Bros. v. Hamilton, 179 Mo. 205; 39 Cyc. 898; Davis v. McCall, 179 Mo. App. 198; Smoot v. Judd, 161 Mo. 673; 8 C. J. sec. 153, p. 92. (2) Under the Missouri law an instrument to be negotiable must comply with the following requisites: First, it must be in writing, and signed by the maker or drawer; second, it must contain an unconditional promise to pay a sum certain in money; third, it must be payable on demand or at a fixed or determinable time, and it must be payable to order or bearer. Sec. 788, R. S. 1919; Sec. 9972, R. S. 1909. (3) And because the certificates in question were not payable in money and because they did not contain a promise to pay at all, they were not negotiable, either at common law or under the Missouri statute. 8 C. J. sec. 225, p. 130; Mathews v. Haughton, 11 Me. 337; Lawrence v. Dougherty, 5 Yerg. 435; Jones v. State, 40 Ark. 345; First Natl. Bank v. Greenville Natl. Bank, 19 S. W. 334; Easton v. Hyde, 13 Minn. 90; Frt. & Cotton Press Co. v. Standard, 44 Mo. 71; Chandler v Calvert, 87 Mo. App. 368; Kessler v. Clayes, 147 Mo. App. 88; Farwell v. Kennett, 7 Mo. 595; Missouri v. Benoist, 10 Mo. 523. (4) The *interim* certificates not being negotiable the purchaser is not protected either by the Law Merchants or the local statutes of Missouri. 8 Cyc. 57; 8 C. J. sec. 1052, p. 797. (5) Under the supreme law of the land all legislative powers are vested in Congress; and the Secretary of the Treasury has never been delegated the power to legislate and make those instruments negotiable which, according to the due course of the common law and local statutes, were not negotiable. U. S. Constitution, art. 1.; Morrill v. Jones, 106 U. S. 466; 17 C. J. sec. 39, p. 477.

SMALL, C.—This suit was in equity against the Federal Reserve Bank of St. Louis, and the People's Bank

of Sullivan, Missouri, to enjoin the Federal bank from delivering to the Sullivan bank certain Liberty bonds called for by twenty *interim* certificates for such bonds which plaintiff claimed to own as an innocent purchaser for value. Eight of said certificates were for $50 each, eleven for $100 each, and one for $500. Each certificate called for a Liberty bond for the amount of such certificate. All the certificates were in the same form and alike, except as to amounts, and were all executed by the Federal Reserve Bank of St. Louis on September 1, 1917. Said form was as follows:

"The United States of America 15-30 Year    Gold Bonds
    "3½% Liberty Loan Full-Paid *Interim* Certificates.
        "Fifty Dollars ($50.00)    100 % paid.

"This is to certify that in accordance with the terms of Treasury Department Circular No. 78, dated May 14, 1917, payment in full has been made for fifty dollars face amount United States 15-30 year 3 ½ per cent gold bonds of the Liberty Loan authorized by Act of Congress approved April 24, 1917. Upon surrender of this Interim Certificate to the undersigned bank, the bearer hereof will be entitled to receive, when prepared, definitive bonds in the face amount of fifty dollars bearing interest from June 15, 1917. This certificate and all rights under and by virtue hereof shall pass by delivery hereof. This certificate shall not be valid unless executed in the name of a Federal Reserve Bank (as Fiscal Agent of the United States) by the cashier or an assistant cashier of such bank.

> "W. G. McAdoo,
> "Secretary of the Treasury.
> "Dates:............

"Federal Reserve Bank of
St. Louis,
    "Fiscal Agents of the United
States
    "By....................
        "Assistant Cashier.
    "1760776

"There must be no writing in this certificate until it is presented for exchange for bonds.

"Upon presentation hereof for exchanges for bonds, when prepared, the following must be filled out and signed by the owner of this certificate:

"The undersigned owner of the within *Interim* Certificate desires:

"One        Bonds of the Denomination of $.............
        "In bearer Form with Coupons Attached.

"Bonds of the Denomination of $.................
        "Registered as to Principal and Interest.

"(Strike out the description of the form of bond not described.)

"Directions for Delivery of bonds.

"Name:

"Address:

"If Registered Bonds are desired, state in whose name they are to be registered and the address of the registered owner:

"Name:.......................

"Address:.......................

"Signature of Owner:...................

"Date:.....................

"In the absence of written request on the foregoing blank for bonds of specific denominations and form, there will be delivered in exchange for this certificate, coupon bonds of the largest denomination or denominations in which coupon bonds are issued and contained in the amount of bonds called for by this certificate.

"Bearer bonds with interest coupons attached, will be issued in denominations of $50, $100, $500 and $1,000. Bonds registered as to principal and interest will be issued in denominations of $100, $500, $1,000, $5,000, $10,000, $50,000 and $100,000. Provision will be for the interchange of bonds of different denominations and of coupon and registered bonds—upon payment, if the Secretary of the Treasury shall require, of a charge not exceeding $1 for each new bond issued upon such exchange. Transfer of registered bonds and exchanges of regis-

tered and coupon bonds and of bonds of different de-
nominations will not be made until October 1, 1917, or
such later date as may be desigated by the Secretary of
the Treasury.

## "There Must Be No Writing on This Certificate Until It Is Presented for Exchange for Bonds."

The petition further stated, that said certificates
were negotiable, that the Liberty bonds called for by said
certificates had been prepared and were held by defend-
ant, Federal Reserve Bank ready to be exchanged for
such certificates, which plaintiff had deposited with said
Reserve bank. But it refused to deliver said Liberty
bonds to the plaintiff, because it claimed said certificates
had been stolen from the defendant, Sullivan bank,
which claimed some right therein, and in the bonds
called for thereby.

The said bonds, being deposited in court by the Fed-
eral Reserve Bank, the suit was dismissed as to it, and
tried as between plaintiff and defendant, Sullivan bank.

The answer of the Sullivan bank admitted, the issue
of the *interim* certificates, the holding of the Liberty
bonds called for therein by the defendant, Federal bank,
the surrender of such certificates by the plaintiff to the
Federal bank, and its refusal to deliver the bonds there-
on to the plaintiff. Denied that plaintiff purchased the
certificates in good faith or paid value therefor.

By way of cross-bill and interpleader, the Sullivan
bank, alleged that it was the owner of said certificates,
having purchased the same from the said Federal Re-
serve Bank. That it placed said certificates in its safe
at Sullivan, Missouri, from which they were stolen by
unknown persons, who broke open the safe and carried
away said certificates. That said certificates are and
were not negotiable. That said defendants is still the
owner thereof. That plaintiff knew at the time it pur-
chased said certificates, that the persons from whom it
obtained them had no title thereto. Wherefore, said Sul-

livan bank asked the court to declare that it was the owner of said certificates and bonds deposited in court, and for general relief.

Plaintiff's reply put the new matter in the answer and cross-bill in issue.

There was an agreed statement of facts, which admitted the form and issue of the certificates as set out by the plaintiff in its petition, and the facts admitted by the pleadings. That said certificates were originally purchased from said Federal bank by the Sullivan bank, and afterwards stolen from it, as alleged in its answer and cross-bill. Touching the acquisition thereof by the plaintiff, the agreed statement recites:

"During October and November, 1917, the Security National Bank of Oklahoma City purchased all of the certificates above mentioned under the situation set out in the deposition of J. C. Eagen and G. L. Kellog heretofore filed in this case. It is stipulated and agreed that said depositions shall be considered a part of this Agreed Statement of Facts, and that such evidence is all the evidence touching the manner in which the Security National Bank of Oklahoma City acquired said *interim* certificates."

J. C. Eagen, testified, for plaintiff, in his deposition, substantially, as follows: That in October and November, 1917, he was an employee of the plaintiff bank. Remembered some of the certificates were purchased from the Kelley Jewelry Company, and an individual named John Garrett, in Oklahoma City, where plaintiff bank was located; each were customers of the bank, and carried deposits with it. He advised the receiving teller to give said jewelry company credit for the face amount of one or more of these certificates. "Q. Did the Security National Bank give credit for the face of each of the certificates you have referred to? A. I have looked it up on the books of the bank, and find that credit was given or cash paid for the full face value of all the certificates."

Continuing, the witness said: "I am under the impression I advised the receiving teller to give the Kelley

Jewelry Company credit for the certificates. I also advised him to cash other certificates, which he had at the same time. The bank received other certificates, besides those in this litigation at that time. It received these certificates in the ordinary course of business. I know of no defect in the title to any of the certificates, and had notice of none. The Kelley Jewelry Company checked out its credit involved in this transaction. I knew of no fact that would lead me to believe that the title to these certificates was defective. The plaintiff bank gave credit or cash for full face amount of the certificates in each case.''

On cross-examination, witness said: Could not recall any conversation with either said Jewelry Company or Garrett, prior to purchase of certificates. Could not recall the particular certificates bought from either, nor which witness handled personally. The particular instances he had in mind were two one-hundred dollar certificates, and some others, fifties and hundreds, could not give their numbers, nor how many were bought from Garrett, nor how many from the Jewelry Company. Had no talk with either of said parties. The Kelley Company informed him, that they had given merchandise for some of the certificates—referred to H. M. Kelley. Witness personally purchased none from Garrett. Garrett still lives in Oklahoma City. He is a trader—trades anything. Kelley is still in the jewelry business within two blocks of the bank.

L. G. Kellogg, in his deposition, testified for plaintiff, substantially as follows: Was assistant cashier of plaintiff bank in September, October and November, 1917. Handled the transaction by which there was purchased from John Garrett certain *interim* certificates, which are the subject of this litigation. He bought in some of the certificates, not certain as to the amount, and asked if the bank would take one or more of them, and witness said it would. ''He asked me if they were worth their face value, and I said they were, and paid him the cash on them.'' To the best of his knowledge, Mr. Kel-

ley's employee, a Mr. Milton, came in with a deposit including one or more of these certificates, and asked if the bank would take them, and witness told him it would. In any transaction handled by the witness, "it was either paid in cash, or deposited to the credit of the parties, the full face amount of the certificate." Witness had no knowledge or notice at the time of any fact which would indicate to him, that the title was not good. The bank at that time was paying cash or giving credit for the full face amount of *interim* certificates of the same series as those involved in this litigation to other persons. Could not say whether there was anyone other than Mr. Eagen and himself, who had anything to do with these certificates. Does not remember of giving any instructions to others to pay cash or give credit for full amount of *interim* certificates. There were about 35 employees in the bank at that time. Cross-examination: Witness had no conversation with Kelley or Garrett as to purchasing certificates, prior to purchase. Nor as to from whom or under what circumstances they purchased the certificates. Could not identify any particular certificates purchased from Kelley or from Garrett.

At the close of the evidence, the plaintiff asked several declarations of law, one to the effect, that under the Act of Congress and the regulations of the Secretary of the Treasury thereunder, the certificates were negotiable instruments and passed by delivery and that a bona-fide holder for value acquired a perfect title by purchase thereof. This declaration the court refused. The plaintiff also asked the court to find, as a matter of fact, that the plaintiff acquired the certificates claimed by it, for value in the ordinary course of business, without notice of the fact that they had been theretofore stolen. This request was refused.

The court entered a decree confirming the agreed statement of facts, but there is no finding in the decree, as to whether plaintiff was a bona-fide purchaser for value. There was, however, a finding in said decree, that said certificates were not negotiable. The decree further

adjudged that the Sullivan bank was the owner of the certificates, and the bonds called for thereby and that plaintiff had no interest therein.

Plaintiff's motion for new trial being overruled, it appealed to this court.

I.  It is no longer a debatable question, that either in time of war, or in time of peace, if the exigencies of the Federal Government in the judgment of Congress require the borrowing of money and issuing **Power of Congress.** of bills of credit therefor, Congress has full power so to do, and to issue such bonds, notes or other obligations of the Government, which shall pass from hand to hand, and be negotiable, and have even the quality of legal tender for the payment of debts, as the Act of Congress may prescribe.  [Legal Tender Case, 110 U. S. 421.]  In that case, as to the form of such obligations, the court says, page 144: " Congress has authority to issue those obligations in a form adapted to circulation from hand to hand, in the ordinary transactions of commerce and business.  In order to promote and facilitate such circulation, to adapt them to use as currency, and make them more current in the market, it may provide for their redemption in coin or bonds and make them receivable in payment of debts to the Government." So that, Congress, itself, by an Act of Congress, could have made these *interim* certificates pass current as negotiable instruments from hand to hand, cannot be doubted.  Indeed, learned counsel for respondent makes no contrary contention.

II.  But learned counsel does contend: First, that the power to make such certificates negotiable is a legislative power or function, which Congress could not dele-gate to the Secretary of the Treasury; and, **Delegation of Power.** second, if it could and did delegate such power, the Secretary did not so exercise such power by the terms he used in such *interim* certificates as to make them negotiable.

· III. As to the power of Congress to delegate such power to the Secretary of the Treasury. Whether such *interim* certificates should be issued and the character

**Administrative Act.** thereof, as to being negotiable or otherwise, we hold, was an administrative matter proper to be vested in the discretion of the Secretary of the Treasury. The purpose of Congress was to raise money to prosecute the World War, and to raise it as expeditiously as possible. The issue of such *interim* certificates or *interim* bonds was a mere detail incident and appropriate to the main purpose for issuing the permanent bonds themselves and might properly be left to the discretion of the Secretary of the Treasury, who was charged with the duty of carrying out the great purpose and undertaking of the Government. It was a proper means to that end and was not prohibited by the Constitution.

In that landmark of the law, McCulloch v. Maryland, 4 Wheaton, 421, the power of Congress to create a banking corporation to carry on the financial affairs of the Government, was determined and Chief Justice MARSHALL, in affirming such power, said: "We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the National Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, and which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

If Congress can create a banking corporation, and give and delegate to it power appropriate or necessary to facilitate and carry on the fiscal operations of the

Government, as held in this celebrated case, it would seem incontestible, that Congress could give the head of the Treasury Department of the Government, itself, authority in his discretion, to determine whether the securities, ultimate or preliminary, to be issued to raise money under the Act of Congress, in the case before us, should be negotiable.

IV.   Did Congress vest the power in the Secretary of the Treasury to make such *interim* certificates, and to make them negotiable? The Act of Congress of April 24, 1917, providing for the issue of the Liberty bonds in question, provided that such bonds should be "in such form and subject to such terms and conditions of issue, conversion, redemption, maturities, payment and rate and time of payment of interest, not exceeding three and one-half per centum per annum, as the Secretary of the Treasury may prescribe."

Sufficient Language.

We hold, this provision gave the Secretary of the Treasury power as one of the terms and conditions subject to which he might issue said bonds to first issue negotiable *intcrim* certificates therefor.   They were appropriate and adapted to expedite the raising of the funds by the sale of the bonds for cash in advance, and the subsequent delivery of the bonds, when prepared. The bonds themselves were to be negotiable and to give the subscribers of such bonds negotiable certificates therefor, would, and without doubt did, greatly facilitate subscription for the bonds, in that the subscribers would receive, when they paid their money to the Government, a negotiable obligation of the Government, which would pass current and be as valuable as the bonds they subscribed and paid for, and which they could use in place of and with equal facility as the bonds, until they received such bonds.

V.   But, it is said, by learned counsel, that in order to make such certificates negotiable, the terms used therein should conform to the common law or to the statute

Form
and
Terms.

law of the State where issued, which, in this State, required an instrument to be payable at a certain time, and in money, in order to be negotiable, whereas, these certificates called for the delivery of other obligations of the Government, to-wit, Liberty bonds, at an uncertain time, to-wit, when said bonds were prepared, and the certificates therefor surrendered.

But, we hold, that it is not necessary to inquire of the statutes of this State or the common law of England as to making such securities negotiable. Not since the decision of the Supreme Court of the United States in the great case hereinbefore referred to, has it ever been suggested that any other law, save the acts of Congress, had any bearing upon the authority or functions of any department or instrumentality of the Federal Government with reference to its financial operations, or any of its operations. Concerning this question, the illustrious Chief Justice said in the McCulloch Case, pages 426-7: "This great principle is, that the Constitution and laws made in pursuance thereof are supreme; that they control the . . . laws of the respective states, and cannot be controlled by them. . . . It is of the very essence of supremacy to remove all obstacles to its action within its own sphere and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." And again, on page 436: "The result is a conviction that the states have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner control, the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."

What the statutes of this State or the English common law provided or required is, therefore, not relevant or germane to the question whether by their terms, said *interim* certificates were negotiable. The only pertinent inquiry is, did the Government of the United States, through the language used by its Secretary of

the Treasury, intend to make them negotiable—pass current from hand to hand—from bearer to bearer — without endorsement — to be "couriers without luggage," as has been somewhere said by this court. In order to be *interim* certificates, at all, it was necessary that they should be exchangeable for bonds at some time certain or uncertain. There was no law of the United States prohibiting the provisions for such exchange being contained therein, or in any manner prescribing or limiting the contents of such certificates or any negotiable securities to be issued by the United States. Being authorized by the Act of Congress to make such certificates negotiable, in his discretion, if the Secretary of the Treasury used language intended to convey the idea, that they were to be negotiable, that is the end of the inquiry and the end of the discussion.

VI.   We hold that the Secretary did so intend, and that such certificates were made negotiable by their terms.

**Delivery by Bearer.**    Such certificates expressly provide that "upon surrender of this *interim* certificate, the bearer hereof will be entitled to receive, when prepared, definitive bonds in the amount of —— dollars, bearing interest from June 15, 1917. This certificate and all rights under and by virtue hereof, shall pass by delivery." Also that, "There must be no writing on this certificate, until it is presented for exchange for bonds." So that, clearly the certificates, with the title to the bonds called for, were intended to pass by delivery without endorsement, the same as a bond or note payable to bearer. It was, indeed, expressly provided that the "bearer" of the certificate should on its surrender be entitled to receive the Liberty bonds mentioned therein. Nothing could be clearer than that they were intended to be and, therefore, they were negotiable instruments.

VII.   We also hold, that under the evidence, the plaintiff was the purchaser for value in due course, without notice of any defect in the title of its vendors, and,

therefore, the bona-fide owner of the certificates in suit. While the lower court refused to so find, as a fact, when thereto requested by the plaintiff, there was no finding at all on the subject in the decree. In said decree, the court based its judgment against the plaintiff, on the ground, that said certificates were not negotiable. This being a suit in equity, the lower court may have disregarded the request of plaintiff to find the fact of its ownership, as unnecessary, and not because it found plaintiff was not such bona-fide purchaser for value. Otherwise, it seems to us, the court would have expressly so stated in its finding of facts in the decree, which it rendered. In any event, the testimony, not being oral, but by deposition, this court may consider it *de novo,* entirely uninfluenced by the finding of the lower court. When so considered, we are satisfied that the plaintiff was a bona-fide purchaser for value of said certificates, and has sustained the burden, which is upon it, to so prove, in view of the fact that said certificates were previously owned by, but feloniously taken from, the defendant, Sullivan bank.

*Bona-Fide Purchaser.*

The result is, the decree of the lower court is reversed, with directions to said court to set aside its judgment heretofore rendered herein, and to enter judgment for plaintiff as prayed, declaring it the owner of said certificates, and the bonds called for thereby, in possession of the court, and that they be delivered to the plaintiff, and that the defendant, Sullivan bank, has no interest therein. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, P. J.,* not sitting.